UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:20-cr-31-SM |
| | ) | |
| JONATHAN SARGENT | ) | |

**MOTION TO SUPPRESS:**
**ALL PHYSICAL EVIDENCE SEIZED FROM 315 E. HIGH STREET**

The Defendant moves this Honorable Court to suppress all evidence seized from 315

E. High Street, Manchester, NH.  The warrant authorizing the search failed to meet the

Fourth Amendment's particularity requirement because the address was a multi-unit

residence rather than a single family home.  As a result, the search warrant lacked

particularity and was unconstitutionally overbroad.  The fruits of that warrant must be

suppressed.  The Defendant requests an evidentiary hearing on this motion.  The

Defendant's memorandum of law is integrated into this motion.  In support of this motion to

suppress, the Defendant submits:

**FACTUAL BACKGROUND**

1.  The Government has charged Sargent with five crimes.  In short, the Government alleges

    the defendant engaged in two street-level sales of fentanyl (Counts 1 and 2).

    Additionally, the Government has charged the defendant with possession with intent to

    distribute 50 grams or more of methamphetamine and 40 grams or more of fentanyl,

    possession of a firearm in furtherance of a drug trafficking offense, and possession of a

    firearm by a prohibited person (Counts 3, 4 and 5).  The following facts are drawn from

the discovery received from the Government and communications with the prosecutor, AUSA Joachim Barth.[1]

2. Manchester Police Detective Christian Horn began this investigation in June, 2019.  At that time, an informant claimed that Sargent, who was incarcerated at the New Hampshire State Prison, was trafficking methamphetamine from prison.  The informant also claimed that Sargent liked firearms and that someone had taken possession of an "AK-47" for him until he was released from prison.

3. In July 2019, Sargent was released from New Hampshire State prison to a sober living house in Keene.    On September 16, 2019, Manchester Police arrested a man named Adam Kulas for possession of 33 grams of methamphetamine.  In a post-*Miranda* interview, Kulas stated that he had been selling methamphetamine for Sargent for a couple months.  Kulas claimed that he would pick up methamphetamine at Sargent's alleged residence, 54 Merrimack Street, Hooksett, NH.  Kulas further claimed that Sargent was regularly picking up large quantities of methamphetamine and possessed several firearms.

4. On October 1, 2019, Detective Horn requested other units stop a vehicle leaving 54 Merrimack Street in Hooksett.  Detectives stopped the vehicle and made contact with the driver, Gary Temple.  After questioning, Temple admitted he was in possession of crack cocaine and was arrested.  In an interview back at the station, Temple said that he had purchased the crack cocaine from Sargent.  Temple stated he had been to 54 Merrimack Street twice to purchase crack and each time he met with Sargent on the first floor in a common area. Temple claimed that Sargent also sold methamphetamine.

---

[1] A copy of the search warrant and accompanying affidavit, which forms a basis for much of the facts above, is attached as Exhibit A.

5. Also on October 1, 2019, Detective Horn observed a man enter 54 Merrimack Street and leave after approximately ten minutes. The man entered a waiting car. Detective Horn requested other units stop the vehicle and make contact with the passenger. Upon stopping the car, detectives identified the passenger as Jason Keno. Keno claimed that he was not in possession of drugs and told the detectives to, "go ahead and search me." During a search, police located a small baggie of what appeared to be methamphetamine. In a post arrest interview, Keno stated he had purchased the methamphetamine from Sargent at 54 Merrimack Street.

6. After receiving the above information, Detective Horn identified a confidential informant ("CI") that claimed s/he could purchase heroin or fentanyl from Sargent. Using that CI, on the evening of October 1, 2019, the Manchester Police set up a controlled buy. After exchanging some initial messages, the CI also allegedly called Sargent. According to Detective Horn, the CI called and requested half a finger (5 grams) of heroin. The person on the other line was difficult to hear but responded something to the effect of "come over." Soon thereafter a controlled buy took place at 54 Merrimack Street, Hooksett, NH. The Government alleges that during that transaction the CI purchased 6.4 grams of heroin from Sargent for $160.

7. On October 2, 2019, Detective Horn applied for, and was granted, a search warrant for 54 Merrimack Street as well as an arrest warrant for Sargent. Prior to the execution of that search warrant, however, detectives learned that all parties residing at 54 Merrimack Street had been evicted by the landlord.

8. Soon thereafter, an informant told Detective Horn that Sargent had moved to 315 E. High Street, Manchester, NH and was living with Michael Cicciu. Cicciu had

previously been arrested for drug sales.  Further, there had been multiple prior arrests out
of that home.

9.  On October 17, 2019, Detective Horn set up a second controlled buy using the CI
referenced above.  The CI indicated that s/he believed Sargent was staying with Cicciu at
his home in the area of E. High Street and Malvern Street.  During this controlled buy
the Government alleges that the CI met with Sargent in the common area of 315 E. High
Street and purchased 5.9 grams of fentanyl for $140.

10.  Based upon the above, Detective Horn applied for and was granted a warrant to search
315 E. High Street, 1st Floor.  The warrant authorized him to search "the premises of 315
E. High St 1 Floor, Manchester, New Hampshire, a multi family residence with yellow
exterior marked with the number '315' on the front of the building to include common
areas, affiliated storage areas associated with 315 E High St 1 Floor, Manchester, New
Hampshire, the curtilage."

11.  Judge William Lyons of the New Hampshire Circuit Court approved the search warrant
on October 21, 2019.  In the early morning hour of October 22, 2019, detectives and the
SWAT team served the search warrant.  During the search of 315 E. High Street, police
seized the drugs and guns that form the basis for the charges in Count 3, 4, and 5.  These
items were seized from a room marked in discovery as "Room E," within 315 E. High
Street, 1st Floor.

12.  Prior to the service of the warrant, police believed Room E was a closet.  However, upon
serving the warrant police recognized it had been adapted to serve as a bedroom or living
area. "Room E," as well as several other areas connecting to the common areas of 315 E.

High Street, were secured by a padlock.[2]  At least one room, referred to as "Room H" in

discovery, had a sign stating "Wild Mike's," indicating that it belonged exclusively to

Michael Cicciu.[3]  This area was also secured with a padlock.  Other areas were similarly

secured via padlock including a lock on the door leading to the basement – which had

been furnished as a separate living area – as well as a lock on what appeared at first to be

a laundry area but has also been furnished as a separate living area.  Notably, two of

these areas – the "laundry area," which had been converted to a room, and the basemen –

were separated from the other living areas and the basement was down a staircase and

the laundry area across a hallway.  Upon observing these separately secured areas, police

did not stop their search but instead continued to search the entirety of 315 E. High

Street, 1st Floor.[4]  The search lasted approximately three hours.

13. Per Detective Horn's report, prior to the service of the search warrant "[d]etectives had]

been inside the residence in past months for search warrants and other investigations."

On April 12, 2019, police served an arrest warrant inside that address.  On or about

September 27, 2019, police responded to an overdose death inside that address.  Further,

on October 17, 2019, police allege they conducted a controlled buy of narcotics from

Sargent in the common area of that address.  Given none of the prior contacts to the

address known to the defense relates to the services of a search warrant, it is possible

---

[2] See, e.g. Exhibit B attached.  In stating that these rooms were "secured by padlock," counsel means that
padlocks were present on the outside of these rooms as they had been adapted as separate, private spaces.
Discovery is unclear, however, as to whether the rooms were locked at the time of the raid.  It is likely that
several of these locks were unlocked at that time merely because the residents of the rooms were within the
room. However, in at least once instance a lock appears to be present on the hinge of the door.
[3] See *id.*
[4] The Manchester Police took two videos of the interior of 315 E. High Street, 1st Floor during the raid: one
before and one after searching.  Each video is approximately two minutes long.  Defense counsel anticipates
seeking to admit those videos as evidence at a hearing on this motion.  The videos clarify the address's layout,
the manner in which the rooms were secured, and the types of personal effects that were secured in private
areas rather than in common areas within 315 E. High Street, 1st Floor.

Manchester Police were also at that address on additional occasions.  Prior to the service
of the search warrant, SWAT members reviewed a PowerPoint presentation regarding
that address.  Accordingly, the record supports that police had reason to be familiar with
the layout and organization of the address prior to the raid.

14. Sargent moves to suppress all evidence seized from 315 E. High Street.

## **LEGAL ARGUMENT**

15. The Fourth Amendment requires a warrant particularly describe the place to be searched
and the persons or things to be seized.  U.S. Const. amend. IV.  Accordingly, when
searching an apartment, hotel or similar multi-unit structure "[t]he particularity
requirement obligates the police to specify the precise unit that is the subject of the
search."  *United States v. Mousli*, 511 F.3d 7, 12 (1st Cir. 2007).  "The general rule is
that a warrant that authorizes the search of an undisclosed multi-unit dwelling is
invalid."  *Id.*  On the other hand, "a warrant for a single unit residence authorizes the
search of that entire dwelling regardless of who the area being searched belongs to, so
long as the items delineated in the warrant could reasonably be found in the searched
area."  *United States v. McLellan*, 792 F.3d 200, 212 (1st Cir. 2015).  Whether a
dwelling constitutes a single-family residence or multi-unit dwelling "is a fact-intensive
and situation specific determination and thus there are no hard-and-fast rules as to what
category any particular dwelling falls into."  *Id.*

16. Here, Sargent submits that 315 E. High Street was a multi-unit residence, analogous to a
rooming house or dormitory.  As a result, a showing of probable cause as to each
occupant's room or an identification of the area(s) controlled by Sargent was necessary
to comport with the particularity requirement.  Because the warrant failed to identify the

unit to be searched, or limit the search to areas controlled by Sargent, the fruits of the search must be suppressed.

**I.  315 E. HGH STREET WAS ORGANIZED AS A MULTI-UNIT DWELLING RATHER THAN A SINGLE-FAMILY HOME**

17. In order to analyze the constitutionality of the search at issue, the court must first determine whether 315 E. High Street, 1st Floor was a multi-unit dwelling or a single-family home.  In the case at bar, 315 E. High Street was akin to a rooming house or dormitory. As a result, each bedroom functioned as a separate dwelling unit for purposes of the Fourth Amendment.

18. 315 E. High Street, 1st Floor is identified in the search warrant itself as "a multi family residence."  *See* Exhibit A.  The occupants of 315 E. High Street were not blood relatives.  Nor were they cohabitating as members of a religious order or fraternal group. *C.f. Comm. v. Frengel*, 26 Pa. D. & C 3d 94 (1982) (finding fraternity house a single-family dwelling based upon numerous common areas and expectation members might roam freely throughout due to "brotherhood" of members).  Upon information and belief, the occupants of the individual living areas rented those rooms separately from the property owner, Cicciu.  The occupants of 315 E. High Street each secured their separate living areas from the other occupants by way of a padlocks, which were visible during the search.[5]  Nothing in discovery indicates that members of the house would have access to another's living area.  In at least one instance, Cicciu's room, a sign on the door specifically indicated that the room designated as Cicciu's exclusive space stating "Wild Mike's."[6]  Upon information and belief, the personal hygiene products of

---

[5] See Exhibit B attached.
[6] Id.

the occupants were secured within their individual living spaces, rather than in common areas.  In essence, the rooms here were separately secured and akin to dorm rooms commonly occupied on college campuses.  *See Piazzola v. Watkins*, 442 F.2d 284, 288 (5th Cir. 1971) (For purposes of the fourth amendment, "[a] dormitory room is analogous to an apartment or a hotel room.") (internal citation omitted).  Though the parties living at 315 E. High Street accessed some common areas, their living areas were essentially separate, and their personal effects were confined to their own rooms.  Accordingly, the address was a multi-unit dwelling requiring the police to request permission to search specific living areas within.

## II. LAW ENFORCEMET WAS FAMILIAR WITH THE LAYOUT OF 315 E. HIGH STREET PRIOR TO THE RAID

19. Even if police search multiple apartments or living units without cause to do so, such a search may be deemed lawful if police reasonably believed there was only one dwelling in the place to be searched.  *See Maryland v. Garrison*, 480 U.S. 70 (1987).  In the instant case, however, police were frequently present at 315 E. High Street and therefore familiar with its layout and character.

20. Discovery reveals that Manchester police had been inside 315 E. High Street on several occasions prior to the October 22, 2019 raid.  On April 12, 2019, police served an arrest warrant inside that address.  On or about September 27, 2019, police responded to an overdose death inside that address.  Further, on October 17, 2019, police allege they conducted a controlled buy of narcotics from Sargent in the common area of that address.  It appears his transaction was video recorded, which would allow police to

observe the inside of the premises.[7]  Additionally, as noted above, Manchester Police's

SWAT team conducted a briefing, complete with a PowerPoint presentation regarding

their intelligence on 315 E. High Street prior to the raid, presumably to ensure officer

safety.[8]  Lead investigator, Detective Christian Horn, further noted in his report that

prior to the raid detectives had "been inside the residence in past months for search

warrants and other investigations."   The record, therefore, suggests that the Manchester

Police were well aware of general living arrangements of 315 E. High Street, 1st Floor

prior to serving the search warrant.

WHEREFORE, the Defendant requests that the Court schedule a hearing on this matter

and, thereafter, grant this motion to suppress, exclude any physical evidence seized from

315 E. High Street from his trial and order any other relief as may be deemed just.

<div style="margin-left:40%">

Respectfully Submitted,
JONATHAN SARGENT
By his Attorney,
GREENBLOTT & O'ROURKE PLLC

/s/ Jeffrey D. Odland

_____

Jeffrey D. Odland, Esq.
NH Bar #18967
Greenblott & O'Rourke PLLC
Concord, NH 03301
(603) 746-1330

</div>

August 6, 2021

<div style="text-align:center">

Certificate of Service

</div>

I certify that this document filed will be sent via the ECF system to AUSA Joachim

Barth.

<div style="margin-left:40%">

/s/ Jeffrey D. Odland

_____

Jeffrey D. Odland, Esq.

</div>

---

[7] The record is somewhat unclear as Detective Horn's report states that he applied for permission to audio/video record and notes that he later reviewed the "audio/video" recording.  However, the evidence log for the recording is noted as "CAH2 audio."

[8] This PowerPoint has been requested but not received by the defense.